FILED
2017 Aug-18  PM 12:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

## Part 1

ELECTRONICALLY FILED
7/13/2017 4:18 PM
11-CV-2017-900399.00
CIRCUIT COURT OF
CALHOUN COUNTY, ALABAMA
KIM MCCARSON, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case<br>11 |
|---|---|---|
| | | Date of Filing:<br>07/13/2017   Judge Code: |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF CALHOUN COUNTY, ALABAMA
### KEVIN J. FEHELEY v. FOREST LABORATORIES, INC. ET AL

**First Plaintiff:** ☐ Business  ☑ Individual   **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☐ Other      ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☑ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Properly

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS  (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/
   Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/
   Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING     A ☐ APPEAL FROM        O ☐ OTHER
                        DISTRICT COURT

            R ☐ REMANDED        T ☐ TRANSFERRED FROM
                                 OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☐ YES ☑ NO   Note: Checking "Yes" does not constitute a demand for a
                                                 jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
   KNI009              7/13/2017 4:18:21 PM          /s/ THOMAS JAMES KNIGHT
   _____         _____          _____
                            Date                     Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**   ☐ YES ☑ NO ☐ UNDECIDED

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>11-CV-2017-900399.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF CALHOUN COUNTY, ALABAMA**
**KEVIN J. FEHELEY V. FOREST LABORATORIES, INC. ET AL**

**NOTICE TO:** FOREST LABORATORIES, INC., HARBORSIDE FINANCIAL PLAZA V, SUITE 1900, JERSEY CITY, NJ 07311

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
THOMAS JAMES KNIGHT

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 1125 NOBLE STREET, ANNISTON, AL 36201

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of KEVIN J. FEHELEY
pursuant to the Alabama Rules of the Civil Procedure.

*[Name(s)]*

| 7/13/2017 4:18:43 PM | /s/ KIM MCCARSON | By: | |
|---|---|---|---|
| *(Date)* | *(Signature of Clerk)* | | *(Name)* |

☑ Certified Mail is hereby requested.     /s/ THOMAS JAMES KNIGHT

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____.

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*          *(Name of County)*

Alabama on _____.

*(Date)*

_____          _____          _____
*(Type of Process Server)*          *(Server's Signature)*          *(Address of Server)*

_____          _____
*(Server's Printed Name)*          *(Phone Number of Server)*

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>11-CV-2017-900399.00 |
|---|---|---|

### IN THE CIRCUIT COURT OF CALHOUN COUNTY, ALABAMA
### KEVIN J. FEHELEY V. FOREST LABORATORIES, INC. ET AL

**NOTICE TO:** MARY JOUBRAN AS PR OF THE ESTATE OF ELIAS JOUBRAN C/O M. DOUGLAS GHEE, POST OFFICE BOX 848, ANNISTON, AL 36202

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
THOMAS JAMES KNIGHT

*(Name(s) of Attorney(s))*

WHOSE ADDRESS(ES) IS/ARE: 1125 NOBLE STREET, ANNISTON, AL 36201

*(Address(es) of Plaintiff(s) or Attorney(s))*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☒ Service by certified mail of this Summons is initiated upon the written request of KEVIN J. FEHELEY
pursuant to the Alabama Rules of the Civil Procedure.

*(Name(s))*

| 7/13/2017 4:18:43 PM | /s/ KIM MCCARSON | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☒ Certified Mail is hereby requested.     /s/ THOMAS JAMES KNIGHT

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____.

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*               *(Name of County)*

Alabama on _____.

*(Date)*

_____          _____
*(Type of Process Server)*          *(Server's Signature)*

_____          *(Address of Server)*

*(Server's Printed Name)*          _____

*(Phone Number of Server)*

ELECTRONICALLY FILED
7/13/2017 4:18 PM
11-CV-2017-900399.00
CIRCUIT COURT OF
CALHOUN COUNTY, ALABAMA
KIM MCCARSON, CLERK

## IN THE CIRCUIT COURT OF CALHOUN COUNTY, ALABAMA

| | | |
|---|---|---|
| KEVIN J. FEHELEY,<br>and as ADMINISTRATOR and<br>PERSONAL REPRESENTATIVE<br>of the ESTATE OF SHEILA CLAY<br>JOUBRAN, deceased, and as<br>GUARDIAN AND CONSERVATOR<br>of KEVIN J. FEHELEY, JR., an<br>and incapacitated person,<br><br>    Plaintiff,<br><br>vs.<br><br>FOREST PHARMACEUTICALS,<br>INC., FOREST<br>LABORATORIES, INC.,<br>MARY JOUBRAN, AS<br>PERSONAL REPRESENTATIVE<br>of the ESTATE OF ELIAS<br>JOUBRAN, deceased,<br>Defendants A, B, C, D, E, and F,<br>whether singular or plural,<br>being those persons firms  or<br>entities who or which proximately<br>caused or contributed to the<br>Plaintiff's damages as complained<br>of herein whose true names<br>are unknown to the Plaintiff but<br>will be  added by amendment<br>when correctly ascertained,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br><br><br><br>CASE NUMBER: 2017-CV-_____ |

## COMPLAINT

**COMES NOW** the Kevin J. Feheley,  as Administrator and Personal

Representative of the Estate of Sheila Clay Joubran, deceased, and as Guardian and

Conservator of Kevin J. Feheley, Jr., an incapacitated person, and states his claims for

relief against Defendant Mary Joubran in her capacity as Personal Representative of the

Estate of Elias Joubran, deceased, and Defendants Forest Pharmaceuticals, Inc., Forest

Laboratories, Inc., and defendants A, B, C, D, E, and F, whether singular or plural, being

those persons, firms or entities who or which proximately caused or contributed to the

Plaintiff's decedent's personal injuries including: wrongful death, mental anguish, past

and future; pain and suffering, past and future; disfigurement, past and future; medical

expenses, past and future; physical impairment, past and future; and lost income, past

and future. Plaintiff alleges that those damages were legally caused by the acts of

Defendant's decedent combining and concurring with the effects of a defective and

dangerous pharmaceutical product, Lexapro, which was manufactured, marketed,

distributed, and/ or sold by Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc.

(collectively, hereinafter referred to as "Forest") to the general public, and prescribed to

Defendant Mary Joubran's decedent, Elias Joubran, as follows:

    1.    Plaintiff, Kevin J. Feheley, is a resident citizen of the state of Alabama and

of Calhoun County.  Plaintiff's decedent Sheila Clay Joubran was killed in Calhoun

County, Alabama where she was a resident at the time of her death. Plaintiff Kevin J.

Feheley, Sr. is the father, guardian and conservator of the sole surviving heir of Shelia

Clay Joubran, namely Kevin J. Feheley, Jr.

    2.    Defendant Mary Joubran as Personal Representative of the Estate of Elias

Joubran, deceased, resides in Tuscaloosa County in the State of Alabama, and her

decedent, Elias Joubran, at the time of his death resided in Calhoun County, Alabama,

where he shot Sheila Clay Joubran, and then shot himself. The estate administered by

Defendant Mary Joubran as Personal Representative of the Estate of Elias

2

Joubran, deceased, is in Calhoun County.

3.    Defendants  Forest Pharmaceuticals, Inc.  ("Forest Pharmaceuticals"), and Forest Laboratories, Inc. ("Forest Labs")  (collectively hereinafter, "Forest") were severally, the marketer, promoter, seller, manufacturer, distributor, and entity which did manufacture, create, design, test, label, package, distribute, market, sell, advertise, fail to warn, and otherwise handle and distribute in commerce, the products,  Lexapro 10mg tablets. Defendants Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc., do business in Alabama and in Calhoun County, and at all times relevant, each sold in Alabama and Calhoun County, the aforementioned drug, and is otherwise subject to this Court's jurisdiction. The defendants do business by agent in this state and county and have caused tortious injury in this state and county by manufacturing and selling a dangerous and defective product. Each defendant acting directly and by agent, is legally responsible to plaintiff as a consequence of that defendant's (A) transacting any business in this state, (B) contracting to supply services or goods in this state, (C) causing tortious injury or damage by an act or omission in this state, (D) causing tortious injury or damage in this state by act or omission outside this state and the defendant regularly does or solicits business, or engages in any other persistent course of conduct or derives of substantial revenue from goods used or consumed or services rendered in this state, (E) causing injury or damage in this state to a person by breach of warranty expressly or implied made in the sale of goods outside this state when the defendant might reasonably have expected such other person to use, consume, or be affected by the goods in this state, and the defendant also regularly does or solicits

3

business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state, and otherwise had or has some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require each defendant to come to this state to defend an action. The amount in controversy in this civil action exceeds the jurisdictional minimum for the circuit courts. This court has jurisdiction hereof both as to the subject matter and in personam.

4.     Plaintiff also brings the action to recover damages for personal injuries, restitution, refunds, and/ or for equitable and declaratory relief against defendants Defendants Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc., which developed, tested, designed, marketed, distributed, prescribed, and sold Lexapro Tablets. These defendants, and other persons whose true names are unknown to the Plaintiff, set about to sell and market Lexapro tablets, throughout the state of Alabama and in such a manner that their conduct was a substantial proximate cause of the injuries suffered by the estate represented by the Plaintiff, Kevin J. Feheley, and his decedent, Sheila Clay Joubran, Defendants A,B,C,D,E, and F, whether singular or plural, are those persons, firms or entities who or which proximately caused or contributed to the Plaintiff's personal injuries and other damages as complained of herein whose true names are unknown to the Plaintiff, but will be added by amendment when correctly ascertained. As used in this Complaint, the general word "Defendant" whether capitalized or not, includes, incorporates, and is defined to mean, not only the named Defendants, but also Defendants A,B,C,D,E, and F, being those persons, firms or entities

4

who or which proximately caused or contributed to the Plaintiff's injuries and other damages as complained of herein whose true names are unknown to the plaintiff, but will be added by amendment when correctly ascertained.

5.      Events constituting part of, and relevant to the Plaintiff's claims occurred in Calhoun County, Alabama.  The Plaintiff and his decedent was and is each a resident of Calhoun County, Alabama.

6.      Defendants Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc.,  are foreign corporations currently engaged in business, directly or by agent in Calhoun County, Alabama. They are collectively referred to sometimes as "Forest" both above and below.

## FACTUAL ALLEGATIONS

1.      Defendant Forest Pharmaceuticals, Inc., is a wholly owned subsidiary of Forest Laboratories, Inc., with its principal place of business in St. Louis, Missouri. Forest Pharmaceuticals, Inc., manufactures, distributes, and sells Forest prescription products in the United States.

2.      Defendant Forest Laboratories, Inc., is a pharmaceutical company organized under the laws of Delaware with its principal place of business in New York, New York. Forest Laboratories, Inc., has a license from H. Lundbeck A/S ("Lundbeck"), a Danish company, to promote and sell Lexapro in the United States.

3.      Celexa and Lexapro are closely-related selective serotonin reuptake inhibitor ("SSRIs") drugs. Lundbeck developed both Celexa and Lexapro, which contains the active agent in Celexa, and subsequently licensed both drugs to Forest for

5

marketing in the United States. Forest began selling Celexa in 1998. In 2002, with Celexa soon due to face generic competition, Forest began selling Lexapro.

4.      In 2002, the Defendants gained FDA approval of Lexapro for the treatment of depression. In 2003, Lexapro received approval for treatment of Generalized Anxiety Disorder ("GAD") in adults. Lexapro has not been approved for any other conditions.

5.      The FDA-Mandated Black Box Warnings On The Celexa And Lexapro Labels On March 22, 2004, the FDA issued a public health advisory requesting that certain SSRI manufacturers, including Forest, change the labels on their SSRI drugs to include "a [w]arning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality." Forest has been aware of an increased risk of the danger of suicide and other violence from its drug as well as of collateral violence to others.

6.      Later that year, the FDA directed the SSRI manufacturers, including Forest, to include on their labels a black box warning and expanded statements to alert physicians about the potential for increased risk of suicidality in children and adolescents taking SSRIs. The black box warning specifically stated that "[a]ntidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders."(Emphasis added). In addition, the FDA required SSRI manufacturers to state, in relevant part, that:

The risk of suicidality for these drugs was identified in a combined

6

analysis of short-term (up to 4 months) placebo-controlled trials of nine antidepressant drugs, including the selective serotonin reuptake inhibitors (SSRIs) and others, in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders. A total of 24 trials involving over 4400 patients were included. The analysis showed a greater risk of suicidality during the first few months of treatment in those receiving antidepressants.

7.     Forest revised the Celexa and Lexapro labels in early 2005 to include the required black box warning and to state under each label's "Pediatric Use" subheading that safety and effectiveness in the pediatric population have not been established (see BOX WARNING and WARNINGS-Clinical Worsening and Suicide Risk)." The Celexa label further stated that "[t]wo placebo-controlled trials in 407 pediatric patients with MDD have been conducted with Celexa, and the data were not sufficient to support a claim for use in pediatric patients," while the Lexapro label stated that a "placebo controlled trial in 264 pediatric patients with MDD has been conducted with Lexapro, and the data were not sufficient to support a claim for use in pediatric patients." Forest was aware that the suicide risk was enhanced in adults as well, but did not warn

8.     In 2007, the Celexa and Lexapro labels were again modified to state that, after evaluating the pooled analyses of placebo-controlled SSRI trials in children and adolescents and of trials in adults, "[t]here was considerable variation in risk of suicidality among drugs, but a tendency toward an increase in the younger patients for almost all drugs studied."

7

9.      Forest maintained a list of "approved" promotional speakers. Forest sales representatives and managers identified speakers from these lists to organize promotional lunches and dinners on Celexa and Lexapro. As late as 2005, approximately 86% of Forest's 2,680 approved speakers were not pediatric specialists, that is, focused on adult health care providers.

10.     Forest augmented its off-label promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Celexa and Lexapro. Forest's marketing department directed some of the kickbacks, such as honoraria for participation in advisory boards and in a large marketing study on Lexapro. Forest's sales representatives, often acting with the knowledge and encouragement of their managers, arranged for other kickbacks, such as restaurant gift certificates for physicians, lavish entertainment of physicians and their spouses, and grants to individual physicians. This had the effect of greatly magnifying the use of the drugs throughout the U.S. market.

11.     Between 2000 and 2005, Forest hosted over 900 local or regional "advisory boards" on Celexa and Lexapro, with over 19,000 advisory board attendees that Forest called "consultants." Forest paid each "consultant" an honorarium of $500.

12.     Forest paid physicians to attend these advisory boards ostensibly to get their feedback on the marketing of Celexa and Lexapro. In reality, as repeatedly reported in internal company documents, Forest intended that the advisory boards induce the attendees to prescribe more Celexa and Lexapro.

13.     In a May 2000 proposal for a series of 44 Celexa (Celexa and Lexapro)

8

advisory boards, a Forest contractor, Intramed, wrote that the advisory boards, each with 20 physicians attendees, would "give Forest an opportunity to influence more physicians." Forest's marketing department approved this proposal. Later that year, Steve Closter, the Forest marketing executive who organized the advisory boards, wrote that the Celexa advisory boards begun in June 2000 had been successful and, as a result, "will become an even larger part of the promotional mix in the future." For years thereafter, Forest's marketing department included the cost of advisory boards in its annual promotional budgets for Celexa and Lexapro.

14.     With the early success of the advisory board programs, the Forest sales force enthusiastically used them to drive up sales. As one Forest District Manager told his Regional Director in a November 2000 planning document, he intended to conduct a local advisory board to "target the highest prescribers" in several of his territories because "[t]here is no doubt that a program of this magnitude will increase Celexa market share." In approximately January 2002, a marketing strategy slide deck given to Forest's chief executive, Howard Solomon, quoted a Regional Director stating that, "[w]ell planned Advisory Board meetings will be key to our efforts of reaching hesitant physicians."

15.     In June 2002, Forest's two Vice Presidents of Sales sent a memorandum to all sales managers observing that, notwithstanding new promotional guidelines for the industry, advisory boards remained among "the wealth of activities and programs that we can conduct that will impact physicians." Similarly, in August 2002, a Forest Regional Director sent an e-mail to his District Managers stating that, "[w]ith the new

9

guidelines in place, Ad Boards have become even a more valuable resource, thus each one needs to be a home run! With your attention and focus, we can make [sic] maximize this opportunity!"

16.     In the fall of 2002, to coincide with the launch of Lexapro, Forest conducted a series of 200 advisory boards reaching over 4,000 potential new Lexapro prescribers.

17.     Forest monitored its return on investment, or "ROI," from the advisory boards. To conduct its ROI analyses, Forest measured the increase in prescriptions written by physicians that attended the local advisory boards, and then compared the value of those prescriptions to the cost — primarily the honoraria payments — of putting on the programs. A November 2000 ROI analysis of a single advisory board program reached the following conclusion:  Post program the Ad Board group [24 attendees] wrote an average of 19.6% Celexa as measured by a 5-week 1st Rx average. This is an increase of 3.7% in share. At first glance, the share increase might not appear substantial. However, considering the volume of SSRIs written by these physicians, 3.7% translates into almost 2000 new prescriptions on a yearly basis.

18.     In May 2001, an internal ROI analysis of all of the Celexa advisory boards in 2000 found that "participants in the program prescribed nearly 14 additional prescriptions of Celexa vs. the control group over a seven-month period."

19.     Three months later, in August 2001, the author of the ROI analysis reiterated to the Celexa marketing team that, "[o]ur goal is to increase the ROI on these advisory boards." That same month, a Forest Regional Director reported to the

company's Vice President of Sales that three local advisory boards had "generated close to $30K" from just a subset of the attendees and that "the scripts will continue, and continue to generate additional $$$ and ROI."

20.     After 2003, Forest stopped conducting ROI analyses of advisory boards because of concerns about memorializing illegal intent, but the company continued to use the same types of advisory board programs as a means of inducing doctors to prescribe Celexa and Lexapro. As a Forest Area Business Director noted in a September 2003 memorandum to his Regional Directors, "[w]e are not able to do as many Ad Boards as we have in the past, so it [is] critical that we get the best targets to the programs." Similarly, in March 2004, a Texas-based Forest District Manager reported to her Regional Director and fellow District Managers that she had met with her sales team about "the types of doctors" they wanted to recruit for an upcoming advisory board and that they had come "up with 40 doctors that are either high Celexa writers or can be converted/persuaded to write Lexapro." In August 2004, a Massachusetts District Manager wrote to his colleagues and sales team that, for an upcoming Lexapro advisory board, "we are looking for the best ROI."

21.     In 1998, Forest successfully used a so-called "seeding study" — a clinical study intended to induce participating physicians to prescribe the drug under study — as part of the promotional strategy for the launch of Celexa. With the launch of Lexapro in 2002, Forest sought to replicate the success of the Celexa seeding study. Forest called the Lexapro seeding study EXCEED (Examining Clinical Experience with Escitalopram in Depression).

22.     In the planning stages for EXCEED, a senior Forest marketing executive

11

wrote that the purpose of the study was to ensure a "fast uptake" for Lexapro. The

overall Lexapro marketing plan, which was reviewed by the company's most senior

executives, stated:  Another component of the rapid uptake of Lexapro will be to

encourage trial. The experience trial for Lexapro (EXCEED) will follow approval

and will be larger in scope than the Celexa experience trial (EASE). More prescribers

will have the ability to trial Lexapro on several patients to gain experience. Trial leads to

adoption and continued usage of a product if a prescriber has successful results.

At the conclusion of EXCEED, Forest's marketing department planned to calculate the

study's "ROI," i.e., the number of prescriptions generated as compared against the cost

of funding the study.

  23. To the extent the EXCEED trial had a scientific purpose, it was secondary

to the purpose of inducing participating physicians to prescribe Lexapro. Forest

conceived the study as a promotional tool and then sought out company scientists "to

discuss possible endpoints/outcomes to look at for our early usage trial." Forest hired

Covance, a contract research organization, to conduct the study, but, according to

Covance's own study implementation plan, Covance, too, understood that "the primary

goal of this trial is to provide experience to physicians." Similarly, Forest openly referred

to the EXCEED trial as a "seeding" study in their internal communications.

  24. Forest aimed the EXCEED study at 2,000 physicians. Under the study

protocol, each participating physician could enroll up to five patients in the study,

which would last eight weeks and involve three patient visits. After the first visit, the

physician would fill out a one- page form with the patient's age, race, gender, and basic

medical history, and Forest would pay the physician $50. After each of the next two

visits, the physician would fill out an additional page requiring the physician to write the date of the visit and to check one of seven boxes describing the change, if any, in the patient's condition. After the physician completed this additional page and two other pages showing the patient's Lexapro dosing information and any adverse events or concomitant medications, Forest would pay the physician an additional $100. Forest ultimately allowed physicians to enroll up to ten patients in the study, so that physicians could make up to $1,500 for starting patients on Lexapro, plus an extra $100 if the physician dialed in to a pre-study teleconference.

25.     By the time the EXCEED study was completed, Forest had made study participation payments to 1,053 physicians, who in turn put 5,703 patients on Lexapro during the course of the study.

26.     Between 1999 and 2003, Forest paid millions of dollars to physicians who participated in so-called "preceptorships." Each physician who participated in a preceptorship received a "grant" of as much as $1,000 per preceptorship.

27.     Ostensibly, preceptorships were a training opportunity where Forest sales representatives would spend a half-day or full day with a physician and learn about how Celexa and Lexapro were used in practice. In reality, Forest sales representatives used the preceptorships to induce physicians to prescribe Celexa and Lexapro.

28.     Forest was fully aware of how sales representatives actually used preceptorships. Company policy mandated that sales representatives fill out "Return on Investment (R.O.I.)" forms to obtain approval to pay a doctor for a preceptorship. Each ROI form provided for a statement of the amount of the payment to the physician and a projection of how many incremental prescriptions the preceptorship would cause, along

with an estimate of the dollar value of those prescriptions to Forest. Thus, the preceptorship ROI forms enabled Forest to evaluate whether a payment to a participating physician was intended to induce an increase in prescriptions sufficient to justify the cost to Forest. Senior Forest sales managers and headquarters staff reviewed and approved the completed preceptorship ROI forms.

29.   The preceptorship ROI forms also provided for sales representatives to write narrative justifications for the preceptorship payments, included the following:

- "Dr. is the managing partner of the ____ Psychiatric Group' and is very influential among his colleagues in the ____ Hospital network. He currently averages @ 12 per week on 1" RX. His #s are trending up even till this day + we need to keep a good thing going as long as we are still getting this kind of growth from Dr. ____."

- "Dr. ____ is the largest prescriber of SSRI's in a 3 state area. . . . We are currently her first line SSRI. We must, however, continue to support her monetarily or this will not continue to be the case. . . . We have to keep the pressure on to continue to receive the growth we are getting with Dr ____."

- "Dr. ____ is my largest prescribing Celexa physician. He is a high maintenance target and doing round tables and preceptorships will help me to keep his business and to continue to grow his business."

- "2 different preceptorhsips. Doc is 3rd ranked phys. in SSRI potential + bus had dropped. Needed his full attention."

- "Dr. ____ is my fourth largest SSRI writer. . . A preceptorship will provide opportunity for rapport and for future detail time and sales."

- "# 1 physician in Territory. . . . Dr. ____ is on the verge of writing a lot of

Celexa. Will present new studies during preceptorship."

- "This full day preceptorship will give me the opportunity to sell Celexa as a first-line choice in doctor's practice."

- "To influence doctor to Rx Celexa."

Forest approved all of these preceptorship payment justifications.

30.     During the period from 1998 through at least 2005, each Forest sales representative typically had a quarterly marketing budget of thousands of dollars to spend on physicians. As a Forest Regional Director put it in an April 2006 memo to his sales team, "we have a ton of promotional money." Forest sales managers put pressure on their sales representatives to spend their entire marketing budgets.

31.     Prior to 2003, Forest sales representatives commonly spent their marketing money on fishing, golf, and spa outings for physicians, and on buying tickets to sporting and the theater for physicians. Both prior to and after 2003, Forest sales representatives also attempted to induce physicians to prescribe Celexa and Lexapro by spending their marketing budgets on restaurant gift certificates, subsidies for physician office parties, and lavish entertainment that could be disguised on an expense report as meals accompanying a supposed exchange of scientific information. Examples of these various types of kickbacks include the following:

- In 1998, a District Manager (whom Forest later named to be its nationwide Director of Compliance) arranged for sales representatives in his district to give St. Louis Cardinals tickets to physicians on the condition, he said, that the tickets be "leveraged and sold as a reward for prescriptions" and that "A Solid Return on Investment can be demonstrated."

15

• In September 2002, a sales representative gave a high-prescribing child psychiatrist a $1,000 gift certificate to Alain Ducasse, a New York restaurant that at the time was one of the most expensive in the United States.

• In June 2001, two Forest sales representatives took a physician and his three sons on a deep sea fishing trip off Cape Cod, Massachusetts.

• In June 2002, a sales representative arranged a salmon fishing charter cruise for four physicians in his territory.

• In February 2002, a sales representative purchased $400 in Broadway theater tickets for a physician and his wife.

• In February 2002, a Division Manager purchased $2,276 in Boston Red Sox tickets for his sales representatives to use, he said, "throughout the next six months with all of our key targets."

• From 2001 to 2005, Forest sales representatives in North Carolina repeatedly arranged social dinners for a psychiatrist who ran multiple offices and reportedly was the highest prescriber of Celexa and Lexapro in the state.

• From 2001 to 2005, Forest sales representatives in Louisiana repeatedly paid for a physician and his family to eat at some of the most expensive restaurants in that state; one of those sales representatives reported that the physician had promised he would "always rxlex [i. e. , prescribe Lexapro] 141 aslong [sic] as we have fun and take care of him." All of this spending was intended to induce physicians to prescribe Celexa or Lexapro. Eventually Forest pled guilty to Federal criminal charges relating to its Lexapro sales practices, according to the Department of Justice.

32.    The foregoing and similar activity has continued in an effort to induce

16

physicians to prescribe Lexapro and to increase sales to persons such as defendant's decedent as a matter of specific intent by the Defendants. Defendants suppressed the true facts as to the dangers of Lexapro, while at the same time, communicating to physicians and to the body of physicians generally that Lexapro was safe and effective with the specific intent to enlarge and enhance the market for Lexapro and with the proximate result that the prescriptions of Lexapro were in fact greatly increased and enhanced, the drug much more generally accepted by the prescribing physician public, and that customers such as Elias Joubran would be prescribed Lexapro by physicians who were not aware of all of the true dangers of the drug including:

     a.    That the drug was particularly dangerous for patients who were already experiencing unusual agitation and upset,

     b.    That the drug was particularly dangerous during the time period shortly after its use was commenced by a patient, and shortly after the dose was increased, in either case, a greater risk for suicide and violence was and is enhanced by the drug,

     c.    That the drug heightened the risk of increased agitation, suicidal behaviors, violent behaviors, and patients acting on thoughts that would otherwise be mediated or restrained by the patient, but in the presence of this drug would, instead, be acted upon, Defendants misrepresented that the increased risk of suicide was essentially, solely, a product of younger age when in fact defendants knew or should have known that the risk was related to factors that occurred more commonly, but not at all uniquely, with younger age, and these factors existed in Elias Joubran and other vulnerable populations who were targeted consumers of the drugs. and,

     d.    On information and belief, Plaintiff avers that neither Elias Joubran, nor

17

his prescribing physician were aware of the extent and true nature of the facts which were misrepresented and or suppressed by Defendants and neither discovered the true facts at any time before the prescription and the acts described elsewhere in this Complaint, all with the proximate result and consequence that the killing of Plaintiff's decedent and the suicide of Elias Joubran took place as elsewhere described herein.

33.    On or about December 29, 2015,  Defendant Mary Joubran's decedent Elias Joubran met with his personal physician, Dr. Russell Ingram.

34.    Dr. Ingram's notes state, "For weeks he has been depressed. Not on Prozac, is taking Xanax ........ Not suicidal...... is anxious, feeling down, sleep poor, appetite poor.....acute stress" Defendant Mary Joubran's decedent, Elias Joubran was prescribed and took Lexapro tablets for depression and Xanax for anxiety by his physician.

35.    On or about December 30, 2015,  Defendant Mary Joubran's decedent, Elias Joubran, entered the Wildwood Lane home belonging to him and his wife, Plaintiff's decedent Sheila Clay Joubran, and shot her with a handgun and then turned the gun on himself and committed suicide. The coroner reports that Elias Joubran died instantly and that Sheila Clay Joubran died shortly thereafter.

36.    At the time of these events,   Defendant Mary Joubran's decedent, Elias Joubran, was under a prescription for, and was ingesting, under certain physicians' prescriptions, certain pharmaceuticals, including those pharmaceuticals manufactured by the defendants as described more particularly herein.

37.    Plaintiff shows that the defendants' pharmaceuticals, Forest's Lexapro,  enhanced, enabled and aggravated Defendant's decedent's depression and

violent behaviors. While antidepressants are designed to decrease the symptoms of depression, they can have the opposite effect and can increase suicidal and violent thoughts and actions. Patients who take selective serotonin reuptake inhibitors (SSRIs) such as Lexapro may experience side effects such as violent behavior, mania or aggression, which can all lead to suicide or violence against others. What begins as withdrawing from friends and activities and a loss of interest in work can escalate to harming oneself. In clinical trials and public use, there have been cases where antidepressant users have thought about, attempted or committed suicide. The drug was particularly dangerous during the time period shortly after its use was commenced by a patient since a greater risk for suicide and violence was and is enhanced by the drug during that initial phase, a danger suppressed by the other Defendants.

38.     Treating depression with antidepressants may improve the condition, but may increase the risk of suicide or violence. Physicians should recommend treatment when the clinical need outweighs the risk, but accurate information from manufacturers and sellers is essential. Prescribing antidepressants has become common practice, with, for example, 164 million prescriptions written for antidepressants in 2008. Sales of SSRIs, specifically, increased by 32 percent from 2000 to 2004, to a combined total of $10.9 billion. Unfortunately, SSRIs, a relatively new class of antidepressants, have been associated with an increased risk of suicide and violent behaviors. In tests of Lexapro and Luvox on certain patients with major depressive disorder, obsessive compulsive disorder and other psychiatric disorders, about 4 percent of patients experienced suicidal thinking, behavior or attempts. In the placebo group, 2 percent of the participants experienced similar problems.

19

39.     Antidepressants have also been linked to akathisia, which is extreme restlessness, agitation and an inability to sit still. The discomfort can be so great that suicide becomes a welcome alternative to feeling this type of agitation. Sometimes akathisia is misdiagnosed as worsening depression, so medication dosage is increased, causing the restlessness to persist. Forest was aware that when new doses are given or increased, there is an enhanced risk period for suicide or violence, but failed to warn adequately of this risk, and actively suppressed, concealed and misrepresented the extent of this enhanced danger.

40.     Plaintiff shows that the combining and concurring acts and omissions of Forest and the other defendants did join with the misconduct of defendant's decedent, Elias Joubran, and that the acts and omissions of the other defendants were a concurring and combining cause which, as to each defendant, was one of the proximate causes of plaintiff's decedent's  death.

41.     As a proximate result and consequence of the acts and omissions of the defendants, and each of them, jointly and severally, the plaintiff's decedent has suffered death and before that, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being.  The Plaintiff Kevin Feheley's decedent has lost her life and Plaintiff is otherwise entitled to recover against all defendants, for wrongful death and other damages allowed by applicable laws.

42.     The pharmaceutical product manufactured by defendants and sold by them, being placed in the stream of commerce by them, were dangerous and defective in that each was unreasonably unsafe when put to the ordinary use and purpose for which

it was sold and designed.

43.     The said drug was dangerous and defective in that it did not meet the reasonable expectations of the ordinary consumer as to safety, and that further it was not accompanied by the proper and necessary warnings that should have been provided with the said drugs to prevent harm and injury by consumers of the said drugs to persons like Defendant's decedent, all of which was reasonably foreseeable to the defendants.  Plaintiffs further allege and aver that defendants were negligent and wanton in their design, manufacture, sale, advertising, failure to warn, and other dealing with, and handling of, the subject products, all of which combined and concurred to be a substantial proximate cause of the harm and injury suffered by plaintiffs as complained of herein.

44.   The defendants, including named and fictitious defendants, were negligent, careless, wanton, and violated the Alabama Manufacturers Extended Liability Doctrine, and their conduct combined and concurred, with the conduct of Defendant's decedent, Elias Joubran, to proximately cause the injuries and damages and losses and the death suffered by the plaintiff's  decedent, Sheila Clay Joubran, deceased, on December 30, 2015, as described herein.

45.     The conduct of the defendants was gross, oppressive, burdensome, willful, intentional, wanton, and otherwise such as to justify the imposition of punitive damages under applicable law.


**PLAINTIFF'S CLAIMS FOR RELIEF**

21

## COUNT I

### PRODUCTS LIABILITY UNDER AEMLD AND STRICT LIABILITY PURSUANT TO §402A OF THE RESTATEMENT (SECOND) OF TORTS

46.   Plaintiff incorporates by reference all other relevant paragraphs into this Count as if fully set forth herein and further alleges as follows:

47.   Defendants' pharmaceutical product Lexapro, which was manufactured, marketed, distributed, and/ or sold by Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and sold by them and A, B, and C, and all the Defendants, who manufactured, marketed, distributed, and/ or sold the said products in the stream of commerce, each had an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer, herein.

48.   The Defendants' pharmaceutical product, Lexapro,  manufactured and sold by Forest and fictitiously designated defendants  products  were defective and unreasonably dangerous in design, manufacture and/or fabrication in that, when they left the hands of the Defendants as manufacturers, sellers, testers, marketers, distributors, promoters, and/or suppliers the foreseeable risks exceeded the benefits associated with the design or fabrication and they were unreasonably dangerous and defective.  Plaintiff shows that he and his decedent suffered injury or damages, including death, as a result of the sale by Defendants who sold the product in defective condition unreasonably dangerous to the ultimate consumer, and all the sellers were engaged in the business of selling such product and the product was expected to and did reach the user or consumer without substantial change in condition in which it was sold.

49.   In addition or alternatively, the pharmaceutical product Lexapro, manufactured and sold by Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and fictitiously designated defendants and/or supplied by them was defective in manufacture, design or formulation, in that, when it left the hands of the manufacturers, sellers,  and/or suppliers, it was unreasonably dangerous, in that it did not meet the reasonable expectations of the ordinary consumer as to safety, and was more dangerous than an ordinary consumer would expect and more dangerous than other relevant products.  The plaintiff  shows that the product was unreasonably dangerous and defective when it left the defendants' control, that it was substantially unaltered when Elias Joubran used it, and that it proximately caused the plaintiff's decedent's death and injuries.

50.   The pharmaceutical product Lexapro,  manufactured and sold by Defendants was also defective due to inadequate warning or instruction because the manufacturers and suppliers knew or should have known that the products created a risk of harm to consumers and the Defendants failed to adequately warn of said risks.

51.   The pharmaceutical product Lexapro, reached the consumer without substantial change in condition in which it was sold and used as intended by the defendants.

52.   The pharmaceutical product Lexapro is not fit for its intended purpose and does not meet reasonable expectations of the ordinary consumer.

53.   The pharmaceutical product Lexapro,  manufactured and sold by Defendants was defective due to inadequate warning and/or inadequate testing.

54.  The pharmaceutical product Lexapro, manufactured and sold by Defendants

was also defective due to unlawful and inadequate marketing and post-marketing warnings or instructions because, after the Defendants knew or should have known of the risk of injury from the pharmaceutical product Lexapro, they failed to provide adequate warnings to prescribers or users or consumers of the product and continued to promote the product.

55.    As a consequence of the above-described producing cause and as a legal result of the dangerous and defective condition of the pharmaceutical product Lexapro, which was designed, manufactured, tested, marketed, distributed, promoted, and sold by Defendants, and as a direct and legal result of the tort, AEMLD violation, negligence, carelessness, other wrongdoing and actions of Defendants described herein:

a.      Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to his health, wellness, ability to earn, and well-being and death;

b.      Plaintiff's disabled child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT II
## PRODUCT LIABILITY (FAILURE TO WARN)

56.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

57.    Defendants are designers, developers, manufacturers, testers, marketers,

24

distributors, promoters, and sellers of the pharmaceutical product Lexapro.

58.   The pharmaceutical product Lexapro, designed, developed, manufactured, tested, marketed, distributed, promoted, and sold by Defendants was and is unaccompanied by proper warnings regarding all possible adverse side effects associated with the use of pharmaceutical product Lexapro, and the comparative severity and duration of such adverse effects; the warnings given did not accurately reflect the symptoms, scope or severity of the side effects.

59.   Defendants failed to perform adequate research, investigation and testing, in that adequate testing, research and investigation would have shown that, used individually and/or in any combination thereof, possessed serious potential hazards with respect to which full and proper warnings accurately and fully reflecting hazards, symptoms, scope and severity should have been made, both with respect to the use of the pharmaceutical product Lexapro, individually and with respect to any combination use with any other pharmaceutical products.

60.   Defendants also failed to effectively warn users and physicians that numerous other suitable pharmaceutical products made by other manufacturers, did not have such severe side effects.

61.   The pharmaceutical product Lexapro, designed, developed, manufactured, tested, marketed, distributed, promoted, and sold by Defendants was defective due to inadequate post-marketing research and warning or instruction because, after the manufacturer, developer, designer, and marketer knew or should have known of the risk of injury from the pharmaceutical product Lexapro, it and they failed to provide adequate warnings to users or consumers of the product and continued to aggressively

promote the product, and no accurate or appropriate warning was given to Defendant's decedent or his physicians by Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., or the other defendants at the point and time of sale or by anyone else.

62.   The producing cause and legal result of the dangerous and defective condition of the pharmaceutical product Lexapro as designed, developed, manufactured, tested, marketed, distributed, promoted, and sold by Defendants, and as a direct and legal result of the negligence, carelessness, wantonness, other wrongdoing and action(s) of Defendants described herein:

a.      Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.      Plaintiff's child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

### COUNT III
### PRODUCT LIABILITY

63.   Plaintiff incorporates by reference to all other paragraphs as if fully set forth here and further alleges as follows:

64.   Defendants are manufacturers and/or suppliers of the pharmaceutical product Lexapro and committed torts in the states of manufacture and design of

Lexapro where strict liability applies.

65.   The pharmaceutical product Lexapro, manufactured and/or supplied by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

66.   Alternatively, the pharmaceutical product Lexapro, manufactured and/or supplied by Defendants was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, it was more dangerous than an ordinary consumer would expect and more dangerous than other forms of this classification of drug.

67.   The pharmaceutical product Lexapro, manufactured and/or supplied by Defendants was also defective due to inadequate warning or instruction because the manufacturer knew or should have known that the product created a risk of harm to consumers and the Defendants failed to adequately warn of said risks.

68.   The pharmaceutical product Lexapro, manufactured and/or supplied by Defendants was defective due to inadequate warning and/or inadequate testing.

69.   The pharmaceutical product Lexapro, manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warning or instruction because, after the manufacturer knew or should have known of the risk of injury from the pharmaceutical product Lexapro, they failed to provide adequate warnings to physicians or users or consumers of the product and continued to promote the product.

70.   With, as the producing cause and legal result of the defective condition of the pharmaceutical product Lexapro, as manufactured and/or supplied by Defendants,

and as a direct and legal result of the negligence, carelessness, other wrongdoing and action(s) of Defendants described herein:

a.     Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.     Plaintiff's child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT IV
## NEGLIGENCE AND WANTONNESS

71.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

72.    Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and fictitious defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of pharmaceutical product Lexapro into the stream of commerce, including a duty to assure that the products did not cause users to suffer from injuries unreasonable, dangerous side effects. Said Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of pharmaceutical product Lexapro, into interstate commerce in that said Defendants knew or should have known that the products, the pharmaceutical product Lexapro, created a high risk of unreasonable dangers and dangerous side effects, some of which

28

can be fatal or crippling.

73.   Said Defendants were negligent and wanton in the design, development, manufacturing, testing, marketing, distributing, promoting, and sale of pharmaceutical product Lexapro, in that they:

a.   Failed to use due care in designing and manufacturing the pharmaceutical product Lexapro, so as to avoid the aforementioned risks to individuals when pharmaceutical product Lexapro, was being prescribed for depression;

b.   Failed to accompany their products with proper warnings regarding all possible adverse side effects associated with the use of pharmaceutical product Lexapro, and the comparative severity and duration of such adverse effects; the warnings given did not accurately reflect the symptoms, scope or severity of the side effects;

c.   Failed to conduct adequate pre-clinical and clinical testing and post-marking surveillance to determine the safety of pharmaceutical product Lexapro;

d.   Failed to provide adequate training to medical care providers for appropriate use of pharmaceutical product Lexapro;

e.   Failed to warn physicians or Defendant's decedent, Elias Joubran prior to actively encouraging the sale of pharmaceutical product Lexapro,  either directly or indirectly, orally or in writing, about the following: (1) about the need for comprehensive, regular medical monitoring to ensure early discovery of increased risk of suicide or violence; (2) the true extent of the dangers of suicide or violence; (3) the dangers of the consequences of violence or suicide; (4) proper monitoring and oversight of the patient;

f.   Failed to warn Defendant's decedent's, physicians and general public of

29

aforesaid side effects, which can cause serious health risks, as noted, Forest was aware

that when new doses are given or increased, there is an enhanced risk period for suicide

or violence, but failed to warn adequately of this risk;

g.    Failed to warn that the costs associated with pharmaceutical product

Lexapro, could exceed other comparable forms of pharmaceuticals, particularly for

those who were like defendant; and

h.    Were otherwise careless, wanton or negligent.

74.    Despite the fact that said Defendants knew or should have known that

pharmaceutical product Lexapro, caused unreasonable, dangerous suicidal tendencies

and effects which many users would be impotent to remedy by any means, said

Defendants continued to market the pharmaceutical product Lexapro, including to

Defendant's decedent's health care providers, when there were safer alternative

methods of pharmaceuticals available.

75.    Said Defendants knew or should have known that consumers such as the

Joubran Defendant's decedent and potential victims would foreseeably suffer injury as a

result of said Defendants' failure to exercise ordinary care as described above.

76.    Said Defendants' negligence and wantonness was a proximate cause of

Plaintiff's decedent's injuries, harm and economic loss which she suffered and will

continue to suffer as previously described:

a.    Plaintiff's decedent was killed after having been injured in health, strength

and activity and suffered injuries to body and mind, including death; Plaintiff's

decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and

other harm, hurt and adverse consequences to her health, wellness, ability to earn, and

well-being and death;

b.     Plaintiff's child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

**COUNT V**
**BREACH OF EXPRESS WARRANTY**

77.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

78.    Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and fictitious defendants expressly warranted that pharmaceutical product Lexapro was safe and well accepted by patients studied, and free from a danger of suicidal side effects.

79.    The subject pharmaceutical product Lexapro, does not conform to these express representations because it is not safe and has high levels of serious dangers, including life threatening side effects of suicide, and did in fact cause Defendant's decedent to commit suicide and homicide.

80.    As a direct and proximate result of the breach of said warranties, Plaintiff suffered and will continue to suffer injury, harm and economic loss as alleged herein:

a.     Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.     Plaintiff's child has sustained economic loss, including loss of earnings

31

and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

81.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

82.    At the time Defendants marketed, sold, and distributed the pharmaceutical product Lexapro, for use by Defendant's decedent, Defendants knew of the use for which the pharmaceutical product Lexapro, was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

83.    Defendant's decedent received the implied warranty from Defendants and Defendant's decedent had no skill and no basis on which to form an independent judgment as to the product of Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc.,  as to whether the pharmaceutical product Lexapro, was of merchantable quality, safe and fit for its intended use.

84.    Contrary to such implied warranty the pharmaceutical product Lexapro, was not of merchantable quality, safe or fit for its intended use, because the product was and is unreasonably dangerous and unfit for the ordinary purpose for which it was used as described above. Defendants otherwise breached the implied warranty.

85.    As a direct and proximate result of the breach of implied warranty:

a.      Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and

other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.    Plaintiff's child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT VII

## MISREPRESENTATION, FRAUD, SUPPRESSION AND DECEIT

86.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

87.    Forest and fictious Defendants were aware that when new doses are given or increased, there is an enhanced risk period for suicide or violence, but fraudulently suppressed information about this risk. Defendants have made, and some of them continue to make, false and fraudulent misrepresentations to physicians and general public including, but not limited to, that the pharmaceutical product Lexapro, is safe, fit and effective for its uses and is not hazardous to the health of users.

88.    At all pertinent times, Defendants conducted, and/or conspired jointly to conduct, a sales and marketing campaign to promote the sale of the pharmaceutical product Lexapro, through advertisements and other promotional literature and fraudulently deceived the Plaintiff, Defendant's decedent,  physicians and the general public as to the health risks and consequences of the pharmaceutical product Lexapro. Defendants also failed to disclose other effective methods for treating depression. Defendants suppressed material facts that, if disclosed to Defendant's decedent or his Physician would have resulted in refusal of use of the pharmaceutical product Lexapro.

33

Forest was aware that when new doses are given or increased, there is an enhanced risk period for suicide or violence, but failed to warn adequately of this risk, and actively suppressed, concealed and misrepresented the extent of this enhanced danger.

89.     Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and fictitiously designated defendants' misrepresentation and suppressions of material facts were done intentionally, willfully, wantonly and/or negligently.  Plaintiff alleges in the alternative or in addition that even if the misrepresentations and suppressions made by Defendants Forest Pharmaceuticals, Inc., and Forest Laboratories, Inc., and fictitious defendants, were merely negligent or even innocent misrepresentations they are nonetheless actionable under Alabama and other applicable law. Defendant's decedent and his physician reasonably relied upon the representations based on the skill and judgment of said Defendants as to whether the pharmaceutical product Lexapro, was of merchantable quality, safe and fit for its intended uses.

90.     In reliance of the foregoing misrepresentation whether innocent, negligent, wanton, or not by Defendants, Defendant's decedent was induced to and did subject himself to the use of pharmaceutical product Lexapro, and committed homicide and suicide.  If the Defendant's decedent and physician had known the true facts, he would not have taken such action and subjected himself to the aforesaid risks.

91.     As a result of  Defendants' negligence, false and fraudulent misrepresentation, fraudulent suppression and concealment, and conspiracy:

a.       Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and

34

other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.      Plaintiff's child has economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT VIII

### CIVIL CONSPIRACY

92.    Plaintiff incorporates by reference all other paragraphs as if fully set forth here and further alleges as follows:

93.    Defendants combined and conspired to do those acts complained of in Count One through Count Eight, as a result of which the Plaintiff and his decedent have suffered harm, damages and injuries as previously described,

a.      Plaintiff's decedent was killed after having been injured in health, strength and activity and suffered injuries to body and mind, including death; Plaintiff's decedent suffered injuries, distress, mental pain, suffering, agony, trauma, fear, and other harm, hurt and adverse consequences to her health, wellness, ability to earn, and well-being and death;

b.      Plaintiff's child has sustained economic loss, including loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown.

## COUNT IX

### WRONGFUL DEATH

94.    Plaintiff adopts and incorporates by reference all the allegations of the original complaint and any amendments thereto as if fully set forth herein.

35

95.    Plaintiff asserts, in addition to the claims asserted  before, the additional claim against all Defendants for the wrongful death of Sheila Clay Joubran, the decedent represented by the Plaintiff Kevin J. Feheley in the estate of which Kevin J. Feheley is administrator and personal representative, and is now plaintiff in this civil action, in that the acts of Defendants as previously alleged and described, combined and concurred and proximately caused the said death of Sheila Clay Joubran, and plaintiff asserts all lawful claims for damages for the wrongful death Sheila Clay Joubran, against all Defendants, named and fictitiously designated, arising from the acts and omissions as previously alleged and described in the civil action and is set forth in this complaint.

**WHEREFORE**, the Plaintiff Kevin J. Feheley, Individually, and as Administrator and Personal Representative of the Estate of Sheila Clay Joubran, deceased,  and as Guardian and Conservator of Kevin J. Feheley, Jr., an incapacitated person, demands  judgment against Defendant Mary Joubran in her capacity as Personal Representative of the Estate of Elias Joubran, deceased, and Defendants Forest Pharmaceuticals, Inc., Forest Laboratories, Inc., and A, B, C, D, E, and F, whose true names are unknown to the Plaintiff but will be added by amendment when correctly ascertained,  jointly and severally, in such sums of compensatory and punitive damages as is found and determined to be fair, just, and lawful under the facts of the case, in both compensatory and punitive damages plus the costs of this action.

36

**/s/ Thomas J. Knight**
Thomas J. Knight (KNI009)
Attorney for Plaintiff
HUBBARD & KNIGHT
1125 Noble Street
Anniston, Alabama 36201
(256) 237-9586
hubbardknight@msn.com


**/s/ George D. Robinson**
George D. Robinson(ROB075)
Attorney for Plaintiff
Robinson Law Firm, LLC
P.O. Box 1336
Anniston, AL 36202-1336
(256) 237-7779


DEFENDANTS MAY BE SERVED AT THE FOLLOWING ADDRESS:

Forest Laboratories, Inc.
Harborside Financial Center Plaza V, Suite 1900
Jersey City, NJ 07311

Mary Joubran as Personal
Representative of the Estate of Elias
Joubran, deceased
c/o M. Douglas Ghee
Post Office Box 848
Anniston, AL 36202